**Joseph C. AMERSBACH, Jr., et al., Plaintiffs-Appellants,**

v.

**CITY OF CLEVELAND et al., Defendants-Appellees.**

No. 77–3237.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 15, 1979.

Decided May 10, 1979.

Thomas C. Simiele, Arthur P. Lambros, Cleveland, Ohio, for plaintiffs-appellants.

Vincent C. Campanella, Malcolm C. Douglas, Norman S. Buckvar, Leonard Ehrenreich, Cleveland, Ohio, for defendants-appellees.

Before LIVELY and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This appeal presents the question of whether employees of the City of Cleveland, Ohio, assigned to duties at the municipally-owned airport, are covered under the minimum wage and maximum hour provisions of the Fair Labor Standards Act, as amended (the Act), 29 U.S.C. § 201 *et seq.* Resolution of this question turns on whether operation of the Cleveland Hopkins International Airport is an "integral government function" within the scope of *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

We conclude that the operation of the municipal airport is an integral governmental function within the meaning of *National League of Cities* and affirm the decision of the district court dismissing the action.

## I

The Act was amended in 1974, Pub.L.No. 93–259, 88 Stat. 55, to extend its wage and hour provisions to virtually all state and local governmental employees. 29 U.S.C. § 203(d), (s)(5), (x). Appellants in the present case are all present or former employees of the Cleveland Department of Port Control, which operates the municipal airport. They filed this action in the district court on January 23, 1976, seeking to recover unpaid overtime, vacation pay, holiday pay, sick pay and wages under the Act. 29 U.S.C. §§ 206 and 207.

Appellants alleged in their complaint that the City is an "enterprise" under the Act, 29 U.S.C. § 203(r); that the City is engaged in interstate commerce under the Act, 29 U.S.C. § 203(s); and that at various times during the course of their employment they had worked in excess of 40 hours a week at rates of pay less than that prescribed under the Act, 29 U.S.C. § 206(a). Appellants prayed for damages and injunctive relief against appellees, the City, and Andrew Patka, Director of the Department of Port Control.

In their answer, appellees admitted that appellants were employees of the City and had not been paid for overtime as prescribed by the Act. While conceding that the City had not complied with the Act, appellees asserted two defenses: (1) that appellants were excluded from the general wage and hour provisions of the Act;[1] and (2) that as applied to the employees of the City's Department of Port Control, the wage and hour provisions of the Act are unconstitutional under *National League of Cities.*

At the close of the pleadings, appellees filed a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), relying on *National League of Cities.* Appellants responded that *National League of Cities* was inapplicable to employees of the City's Department of Port Control because operation of a municipal airport is a proprietary rather than a governmental function and, therefore, not within the scope of *National League of Cities.*

The district court rejected appellants' analysis of *National League of Cities* and dismissed the complaint as failing to state a claim upon which relief could be granted. This appeal followed.

## II

For purposes of this appeal, the court must accept as true all well-pleaded allega-

1. Appellees alleged in their answer that appellants were firemen and exempted from the general wage and hour provisions of the Act. 29 U.S.C. § 207(k). This defense is not at issue on the appeal and we express no view as to its merits. Since the district court dismissed the action for failure to state a federal claim, we are required to proceed as if this defense had never been raised. 2A Moore's Federal Practice, ' 12.15 (2d ed. 1975).

tions of the complaint. 5 Wright & Miller, Federal Practice and Procedure: Civil § 1367; 2A Moore's Federal Practice ¶ 12.-08. *See also Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 353 F.Supp. 264, 268 (S.D.N.Y.1972), aff'd, 495 F.2d 228 (2d Cir. 1974). We, therefore, accept as true that the City is an employer under the definitions of the Act and has failed to comply with the wage and hour provisions prescribed by the statute. The question remaining is whether the City is correct in asserting, as a defense, the constitutional doctrine of governmental immunity enunciated in *National League of Cities.*

In *National League of Cities,* the Supreme Court held the 1974 wage and hour provisions of the Act unconstitutional as they applied to state and local government employees generally because those sections of the Act "impermissibly interfere with the integral governmental functions of these bodies." 426 U.S. at 851, 96 S.Ct. at 2474. In reaching this conclusion, the Court distinguished federal regulation of private persons and business "necessarily subject to the dual sovereignty of the government of the Nation and of the State . . ." from similar regulation "directed, not to private citizens, but to the States as States." *Id.* at 845, 96 S.Ct. at 2471. Although the Court conceded that the wage and hour provisions at issue were within the scope of the powers of Congress under the commerce clause, it found that federal wage and hour determinations with respect to "functions . . . which [state and local] governments are created to provide, [involving] services . . . which the States have traditionally afforded their citizens," were matters essential to the separate and independent existence of those governments and hence beyond the reach of congressional power under the commerce clause. *Id.* at 851, 96 S.Ct. at 2474.[2] The court expressly overruled *Mary-*

land v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), which had upheld extension of the Act to employees of state schools, hospitals and like public institutions.

In *National League of Cities* the court relied upon the tenth amendment as the source of a state sovereignty limitation upon congressional power under the commerce clause. 426 U.S. at 842–43, 96 S.Ct. 2465. The Court quoted *Fry v. United States,* 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), in support of the sovereignty limitation.

"While the Tenth Amendment has been characterized as a "truism," stating merely that 'all is retained which has not been surrendered,' *United States v. Darby,* 312 U.S. 100, 124, [61 S.Ct. 451, 85 L.Ed. 609] (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system."

426 U.S. at 842–43, 96 S.Ct. at 2470.

This court has viewed the holding in *National League of Cities* as creating an affirmative defense against compliance with congressional enactments or regulations which intrude into the protected area of state sovereignty. *See Marshall v. Owensboro-Daviess County Hospital,* 581 F.2d 116, 120 (6th Cir. 1978).

This affirmative state sovereignty limitation on congressional power under the commerce clause, as enunciated in *National League of Cities,* has been held to be limited to those situations where it can be shown that (1) a congressional enactment (in the exercise of commerce clause powers) operates to displace, regulate or significantly

---

2. The Court was careful to narrow the scope of its constitutional analysis to federal exercise of power under the commerce clause. Specifically the Court left open the applicability of its analysis to "the scope of Congress' authority under its war power," 426 U.S. at 855 n. 18, 96 S.Ct. at 2476, n. 18, as well as other constitutional powers "such as the spending power

. . . or § 5 of the Fourteenth Amendment." *Id.* at 852 n. 17, 96 S.Ct. at 2474, n. 17. *Cf. Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). We likewise confine the opinion in the present case to congressional power under the commerce clause.

alter[3] (2) the management, structure or operation[4] of (3) a traditional or integral governmental function.[5]

Clearly the first two of these elements are present in the instant case. The wage and hour provisions of the Act are direct mandates on the City. Implementation of the Act would necessarily alter the City's employer-employee relations and interfere with the operation of the Department of Port Control by regulating the hours of employees. Additionally, there is virtually no discretion allowed to an employer in implementing the provisions of the Act. The City would face the alternative either of increasing wages or reducing its complement of Port Control employees. In these respects, the present case is virtually identical to *National League of Cities*.

However, the Supreme Court confined the parameters of this sovereignty limitation to those public services or activities which involve traditional or integral governmental functions. *Public Service Co. of North Carolina, Inc. v. Federal Energy Regulatory Commission,* 587 F.2d 716, 721 (5th Cir. 1979); *Marshall v. City of Sheboygan,* 577 F.2d 1, 4 (7th Cir. 1978). The court spoke of those activities "[typically] performed by state and local governments in discharging their dual functions of adminis-

tering the public law and furnishing public services." 426 U.S. at 851, 96 S.Ct. at 2474. *See* Tribe, *Unraveling National League of Cities: The New Federalism and Affirmative Rights to Essential Government Services,* 90 Harv.L.Rev. 1065 (1977); Michelman, *States' Rights and States' Roles: Permutations of "Sovereignty" in National League of Cities v. Usery,* 86 Yale L.J. 1165 (1977). The meaning of this limitation is the controlling question in the present case.

In *National League of Cities* the Court characterized the dimensions of the state sovereignty limitation upon congressional commerce clause power in terms of " ' "functions essential to [the] separate and independent existence" ' " of local governments, 426 U.S. at 845, 96 S.Ct. at 2471; activities of the "States qua States," *Id.* at 847, 96 S.Ct. 2465; "integral governmental functions," *Id.* at 851, 96 S.Ct. 2465; and "traditional governmental functions," *Id.* at 852, 96 S.Ct. 2465. The Court identifies as typical of these traditional-integral governmental functions fire prevention, police protection, sanitation, public health and parks and recreation. By overruling *Wirtz,* the Court implicitly included the operation of public schools, hospitals and like public health care institutions within the category

**3.** *Cf. Montgomery County, Maryland v. Califano,* 449 F.Supp. 1230, 1243 (D.Md.1978); *Florida Department of Health v. Califano,* 449 F.Supp. 274, 284 (N.D.Fla.), *aff'd,* 585 F.2d 150 (5th Cir. 1978); *City of Macon v. Marshall,* 439 F.Supp. 1209, 1216-17 (M.D.Ga.1977), holding that congressional action under the spending powers of Congress does not directly regulate the states.

**4.** *See Maryland v. EPA,* 530 F.2d 215 (4th Cir. 1975), *vacated sub nom. EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); *District of Columbia v. Train,* 172 U.S.App.D.C. 311, 521 F.2d 971 (1975), *vacated sub nom. EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); *Brown v. EPA,* 521 F.2d 827 (9th Cir. 1975), *vacated sub nom. EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), *on remand,* 566 F.2d 665 (9th Cir. 1977), noting that federal imposition of various antipollution plans posed serious tenth amendment problems.

**5.** In *Fry v. United States,* Justice Rehnquist recognized the difficulties posed by the traditional-integral characterization of government

functions. Admitting that gray areas presented by this approach would require a case-by-case resolution, Justice Rehnquist observed:

> that a line will have to be drawn somewhere. It is conceivable that the traditional distinction between "governmental" and "proprietary" activities might in some form prove useful in such line drawing. The distinction suggested in *New York v. United States,* 326 U.S. 572, [66 S.Ct. 310, 90 L.Ed. 326] (1946), between activities traditionally undertaken by the State and other activities might also be of service . . . . .

*Fry,* 421 U.S. at 558 n. 2, 95 S.Ct. at 1801 n. 2 (Rehnquist, J. dissenting). *See also National League of Cities,* 426 U.S. at 856, 96 S.Ct. 2465 (Blackmun, J. concurring) suggesting a balancing approach in determining whether a particular public service or activity is immune from Congressional commerce power. *Friends of the Earth v. Carey,* 552 F.2d 25, 37 (2d Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977).

of traditional-integral government functions. *See also Fry,* 421 U.S. at 557–58, 95 S.Ct. 1792 (Rehnquist, J. dissenting). *Cf. United States v. Best,* 573 F.2d 1095, 1102–03 (9th Cir. 1978) (state licensing of drivers an integral governmental function and beyond the equitable powers of the federal courts to revoke a license issued by a state).

The only activity of government that *National League of Cities* expressly excluded from the classification of traditional or integral was the state operation of a railroad discussed in *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). *See also Fry,* 421 U.S. at 552, 95 S.Ct. 1792 (Rehnquist, J. dissenting). The Court observed that the operation of a railroad engaged in "common carriage" . . . "was not in an area that the States have regarded as integral parts of their governmental activities." 426 U.S. at 854 n. 18, 96 S.Ct. at 2475. *Cf. Massachusetts v. United States,* 435 U.S. 444, 454–60, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978) (operation of police helicopter not immune from federal use tax); *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 424, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (Burger, C. J. concurring) (the supplying of electric service has not traditionally been the prerogative of the States for purposes of the state action exemption under the Sherman Act); *New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946) (state bottling and sale of mineral water not immune from federal tax); *Allen v. Regents,* 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938) (public corporation created by the state to operate state athletics program not performing an essential government function for purposes of tax on admissions to athletic events); *Ohio v. Helvering,* 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934) (state liquor business is a "nongovernmental [function], and the business, though conducted by the state, is not immune from the exercise of the power of taxation"); *Public Service Co. of North Carolina, Inc. v. Federal Energy Regulatory Commission,* 587 F.2d 716, 721 (5th Cir. 1979) ("Texas's oil and gas business is not a 'traditional government function' ").

Although the opinion of the court does not contain a specific outline of the dimensions of the state sovereignty limitation, the definition suggests that the terms "traditional" or "integral" are to be given a meaning permitting expansion to meet changing times. Furthermore, *National League of Cities* does not articulate a specific test to be applied in determining whether a particular government function should be deemed to be within this protected area of state sovereignty.[6]

By analyzing the services and activities which the Court characterized as typical of those performed by governments, we note certain elements common to each which serve to clarify and define a method by which a protected government function may be identified. Among these elements are: (1) the government service or activity benefits the community as a whole and is available to the public at little or no direct expense; (2) the service or activity is undertaken for the purpose of public service rather than for pecuniary gain; (3) government is the principal provider of the service or activity; and (4) government is particularly suited to provide the service or perform the activity because of a communitywide need for the service or activity.

Viewing the present case in relation to the elements noted above, we conclude that operation of the Cleveland Hopkins International Airport is an integral governmental function within the meaning of *National League of Cities.* In operating the airport, the City is providing terminal facilities for commercial air carriers and related services vital to an effective air transportation system. As such, operation of the airport has much in common with those services and activities enumerated in *National League of Cities.*

Airports are indispensable in a nation where airplanes are relied upon as a principal mode of passenger transportation. Experience has demonstrated that airports

---

6. 426 U.S. at 880, 96 S.Ct. 2465 (Brennan, J. dissenting).

must be maintained by municipal corporations or other units of government. Privately-owned airports serving municipalities are virtually unknown.[7] We would have difficulty in concluding that, in the economy of the present day, the maintenance of a municipal airport is not an integral function of government.

### III

Appellants also contend that the district court erred in dismissing the complaint for failure to state a claim, a Rule 12(b)(6) defense, when the motion before the court was for judgment on the pleadings under Rule 12(c). We do not agree.

■■■ Rule 12(c) may be employed as a vehicle for raising several of the defenses enumerated in Rule 12(b), including the defense of failure to state a claim upon which relief may be granted. *See* 5 Wright & Miller, Federal Practice and Procedure: Civil § 1367. In the present case, appellees' Rule 12(c) motion raised what was essentially a Rule 12(b)(6) defense by challenging the legal basis of the complaint. The mere fact the motion was couched in the terms of Rule 12(c) does not prevent the district court from disposing of the motion by dismissal rather than by judgment. *Jones v. Tennessee Eastman Co.*, 397 F.Supp. 815, 816 (E.D.Tenn.1974), *aff'd*, 519 F.2d 1402 (6th Cir. 1975); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 353 F.Supp. 264, 268 (S.D.N.Y.1972), *aff'd*, 495 F.2d 228, 231 n. 2 (2d Cir. 1974). *See also George C. Frey Ready-Mix Concrete Inc. v. Pine Hill*

*Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977).

We agree with the district court that the decision of the Supreme Court in *National League of Cities* is controlling. The decision of the district court dismissing the action for failure to state a claim upon which relief can be granted is affirmed.

---

7. At present, there are 475 airports serving the fifty states, Guam, Puerto Rico, American Samoa, the Trust Territory of the Pacific Islands, and the Virgin Islands that are certified by the Federal Aviation Administration to service scheduled commercial air carriers. *See generally* 14 C.F.R. §§ 139 *et seq.* Of this total, only two airports are currently operated by private concerns; the Hollywood-Burbank Airport operated by the Hollywood-Burbank Airport Authority and the heliport atop the Pan American Building in New York operated by New York Airways Incorporated.

Of the remaining 473 airports, 69 are operated by states, 95 are operated by counties, 17 are joint city-county operations, 260 are operated by cities (including Cleveland Hopkins Inter-

national), and 32 are operated by other public entities (including the federal government, the military, and regional airport authorities). *See* data on file with the National Flight Data Center, Federal Aviation Administration, United States Department of Transportation, Washington, D. C. *See generally*, C.A.B. & F.A.A., Airport Activity Statistics of Certified Route Air Carriers (Dec. 31, 1977) (data concerning the volume of revenue passenger, freight, express, and mail traffic handled by the nation's certified route air carriers); F.A.A., Eighth Annual Report of Operations Under the Airport and Airway Development Act (April 17, 1978) (report detailing the role of federal funds in airport operations and development).