**Vernon W. DOVE, and other plaintiffs similarly situated**

v.

**CHATTANOOGA AREA REGIONAL TRANSPORTATION AUTHORITY.**

No. CIV-1-80-249.

United States District Court, E. D. Tennessee, S. D.

July 21, 1981.

S. Del Fuston, Chattanooga, Tenn., for plaintiffs.

George M. Derryberry, Chattanooga, Tenn., for defendant CARTA.

John B. Phillips, Jr., Stophel, Caldwell & Heggie, Chattanooga, Tenn., and William T. Coleman, Jr., Robert S. Draper, and Donald T. Bliss, O'Melveny & Myers, Washington, D. C., for American Public Transit Ass'n, amicus curiae.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

This is an action for declaratory relief, back pay and damages brought pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (the "Act"). At issue in this litigation is whether the operation of the Chattanooga Regional Area Transit Authority ("CARTA"), a metropolitan transit system created, owned and operated by the City of Chattanooga, Tennessee, is an "integral governmental function" within the scope of the Supreme Court's decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Jurisdiction is invoked pursuant to 29 U.S.C. § 216(b) and is not disputed. The case is presently before the Court upon the following motions: (1) the motion for summary judgment, filed by CARTA (Court File # 5); (2) the motion to intervene as *amicus curiae*, filed by the American Public Transit Association (Court File # 9); (3) CARTA's motion for consideration of the *amicus* brief (Court File # 10); and (4) the motion to file a responsive brief, filed by the American Public Transit Association (Court File # 17).

In support of its motion to intervene as *amicus curiae*, the American Public Transit Association ("APTA") states as grounds therefor that it is the national representative of entities operating local public mass transit systems; that it is the national repository for information and research about local public mass transit systems, and, as such, it is uniquely situated to provide useful information about the operation of such systems; and, that it has an important interest, on behalf of its members, in the question of whether the overtime compensation requirements of the Act should be applied to local public mass transit systems. The defendant CARTA has moved the Court to consider APTA's *amicus* brief and supporting affidavits. The Court being of the opinion that the APTA has sufficient interest to be entitled to enter an *amicus* appearance, the motion to intervene as *amicus curiae* (Court File # 9) and CARTA's motion for consideration of the *amicus* brief (Court File # 10) will be granted. APTA's motion for leave to file a response to a letter to the Court, written by counsel for the plaintiffs, is granted.[1]

Numerous affidavits and exhibits have been filed in support of, and in opposition to, the motion for summary judgment. The following relevant facts appear undisputed. CARTA is a metropolitan transit

---

1. In a letter dated May 1, 1981, counsel for the plaintiffs sent to the Court an unpublished opinion by District Judge Owens in *C. D. Joiner v. City of Macon*, No. 79–287–MAC (M.D.Ga., April 24, 1981), which appears relevant to the issues in this lawsuit. Although the Court ap-

preciates counsel's diligence in forwarding Judge Owens' opinion so promptly, the proper procedure in doing so was to file the materials with the clerk of the court. *See* Local Rule 13, Eastern District of Tennessee.

authority created in 1971 by the City of Chattanooga, Tennessee, pursuant to Chapter 515, 1970 Public Acts, as amended by Chapter 160, 1971 Public Acts of the State of Tennessee. It is governed by a Board of Directors, which consists of one representative from each municipality that participates in the operation of the system, except Chattanooga, which appoints a number of directors equal to the total of all participating municipalities plus one. The Authority operates a public transportation system throughout its service area, which includes Chattanooga and other municipalities in Hamilton County, Tennessee, and Lookout Mountain, Georgia. By means of federal capital grants and local government funds, CARTA acquired all private bus lines in its service area by the end of 1973. Prior to that time, mass transportation in the area was provided by means of privately-owed and operated carriers. CARTA currently operates 69 buses over 24 routes and a fixed rail service between Chattanooga and Lookout Mountain, Tennessee. In fiscal year 1980, CARTA carried approximately 4.6 million riders. Affidavit of Alfred E. Smith, CARTA Board Chairman, Court File # 6.

CARTA generally derives 80% of its capital expenditure funds through federal grants from the Urban Mass Transportation Administration ("UMTA"). Another 10% is obtained by grants from the Tennessee Department of Transportation, and 10% is derived from the local governments served by CARTA. Operating expenses are acquired by means of fares, UMTA operating grants, and state and local government operating grants. The fiscal year 1981 operating budget has an operating expense of $5,645,-600, of which fares provide only $2,631,700.

CARTA employs 83 operators, as well as maintenance and clerical personnel. The plaintiffs, CARTA employees, filed this action alleging that the defendant has not paid them wages for hours over 40 hours per week at a rate of time and one-half of the plaintiffs' regular hourly rate. The plaintiffs allege that, as a result, CARTA has violated the Fair Labor Standards Act (FLSA), specifically 29 U.S.C. § 207(a).

CARTA has answered the complaint and raises, by this motion, its defense that the provisions of the FLSA as applied to CARTA are an unconstitutional exercise of Congress' power under the Commerce Clause of the United States Constitution. U.S.Const., Art. I, Sec. 8, cl. 3.

The American Public Transit Association has filed the affidavit of Herbert J. Scheuer, its executive director of administration, in support of CARTA's motion for summary judgment (Court File # 8). According to Mr. Scheuer, the APTA collects and analyzes data concerning the mass transit industry in the United States. That data shows that, from the years 1967 to 1978: (1) the total number of transit vehicles owned by publicly-owned transit systems grew from 48% to 87% of the total owned by the industry as a whole; (2) the total number of vehicle miles traveled by publicly-owned transit systems grew from 51% to 90% of the industry total; and, (3) the total number of linked-passenger trips by publicly-owned transit systems grew from 62% to 91% of the industry total.

In opposition to the motion for summary judgment, the plaintiffs have filed the affidavit of Alexander Cohn, the Assistant General Counsel of the Amalgamated Transit Union, AFL–CIO (Court File # 16). According to Mr. Cohn, the data collected by the Amalgamated Transit Union indicates that the overwhelming majority of urban mass transit employees receive time and a half pay for hours worked over 40 hours per week "by contract". The conclusion that Mr. Cohn draws from this information is that the overtime pay requirements of the FLSA has a very slight impact upon the United States mass transit industry as a whole.

In 1974, the FLSA was amended to extend its wage and hour provisions to virtually all state and local governmental employees. *See* 29 U.S.C. § 203(d), (s)(5) and (6), and (x). In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court, in a plurality decision, held the 1974 wage and

hour provisions of the FLSA unconstitutional as they applied to state and local governments. The Court found that the wage and hour provisions were within the scope of the powers of the Congress under the commerce clause, but found that the Tenth Amendment operated as a limitation upon Congress' power to regulate commerce insofar as that regulation involved "functions essential to [the] separate and independent existence" of local governments. 426 U.S. at 845, 96 S.Ct. at 2471, 49 L.Ed.2d at 254. The Court expressly overruled *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), which had upheld the application of the FLSA to employees of state schools, hospitals, and other public institutions.

In *National League of Cities* the Supreme Court was not particularly clear in defining those functions of state and local governments that were exempt from Congressional power under the commerce clause. The Court held the 1974 amendments could not be constitutionally applied to state and local governments because their application would:

> "significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services.[16]"

426 U.S. at 851, 96 S.Ct. at 2474, 49 L.Ed.2d at 257. The Court stated, at note 16, that the list of examples it had given in the text was not exhaustive "of the numerous line and support activities which are well within the area of traditional operations of state and local governments." *Id.* The Court did note that the operation of a railroad engaged in "common carriage by rail in interstate commerce", as was found in *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), was not an integral function of state government and thus not protected by the Tenth Amendment from Congress' power under the commerce clause.

As noted above, *National League of Cities* was a plurality decision, and the deciding vote for the majority was cast by Mr. Justice Blackmun. In his separate opinion, Justice Blackmun suggested that the opinion adhered to by the remaining Justices in the majority adopted a "balancing approach," in which the integral and traditional functions of state and local governments would not be immune from Congress' commerce clause powers when the federal interest in the subject matter under regulation is "demonstrably greater." 426 U.S. at 856, 96 S.Ct. at 2476, 49 L.Ed.2d at 260.

The Supreme Court had occasion recently to explain further its holding in *National League of Cities* in the case of *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Hodel*, the Supreme Court stated that

> "in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the 'States as States.' . . . Second, the federal regulation must address matters that are indisputably 'attributes of state sovereignty.' . . . And, third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional functions.' "

452 U.S. at 287, 101 S.Ct. at 2366.

In an opinion written by Senior Circuit Judge Harry Phillips, the Sixth Circuit Court of Appeals noted several elements common to the services and activities that the Supreme Court considered functions of state and local governments protected from Congress' commerce clause powers. Those elements were:

> "(1) the government service or activity benefits the community as a whole and is available to the public at little or no direct expense; (2) the service or activity

is undertaken for the purpose of public service rather than for pecuniary gain; (3) government is the principal provider of the service or activity; and (4) government is particularly suited to provide the service or perform the activity because of a communitywide need for the service or activity."

*Amersbach v. City of Cleveland*, 598 F.2d 1033, 1037 (6th Cir. 1979). Judge Phillips noted also that, although the Supreme Court opinion did "not contain a specific outline of the dimensions of the state sovereignty limitation, the definition suggests that the terms 'traditional' or 'integral' are to be given a meaning permitting expansion to meet changing times." *Id.* In *Amersbach*, the Sixth Circuit determined that the operation and maintenance of the City of Cleveland's Hopkins International Airport was an "integral government function" within the scope of *National League of Cities.*

The parties have cited several cases dealing with the issue of whether public mass transportation is a traditional or integral function of state and local governments within the meaning of *National League of Cities.* In *Alewine v. City Council of Augusta, Georgia*, 505 F.Supp. 880 (S.D.Ga. 1981), employees of the Transit Department of the City of Augusta filed an action seeking to recover compensation for back pay alleged to be due them as overtime pay under the maximum hours provisions of the FLSA. Prior to 1974, Augusta's transit system was privately owned and operating under a franchise from the city. Because of the steadily declining financial condition of the Augusta Coach Company, the city acquired the transit system, and, after receiving grants from UMTA, began operating the system as a department of the city government. The system had operated at a considerable loss to the city throughout its existence and these operating losses were paid by both federal and city funds.

Relying in part upon the Sixth Circuit's decision in *Amersbach, supra*, the district court stated the following:

"I cannot conclude that traditional government functions must be those which are time honored, hoary, or historic. Integral operations of traditional government functions may be those which the public has come to expect and demand in light of the change of times and needs of society. Here, the city's operation of the transit department benefits the community as a whole, is available to the public at small cost, is undertaken for the purpose of public service rather than pecuniary gain, and government is the principal provider of the service and is particularly suited to provide the service. There is an obvious community wide need for the service. Accordingly, within the view of the *National League of Cities* case as I interpret the terms from the usage of the Supreme Court, the operation of the City Transit Department of Augusta is an integral operation of traditional governmental function."

505 F.Supp. at 889.

An action for backpay for compensation alleged to be due as overtime pay was brought in *C. D. Joiner, et al. v. City of Macon*, Civil Action No. 79–287–MAC, (M.D.Ga., April 27, 1981). In that case, the district court held that the operation of the Macon Transit System was not an integral operation in an area of traditional governmental functions within the scope of *National League of Cities.* The district court based its decision upon three grounds: (1) the operation of the transit system was not a traditional function essential to the sovereign existence of the state, because (a) only about 10% of Macon's citizens used the system, (b) the system was set up so as to pay its own way in large part, and (c) economic considerations, and not community needs, dictated transit routing, scheduling and administration; (2) requiring the transit system to comply with the FLSA would not "directly displace" the state function because the majority of public transit systems in the United States already provide overtime pay for work over 40 hours per week without apparent disruption; and (3) the federal interests in regulating urban mass

transportation are "demonstrably greater" than the state's interests.

In *United Transportation Union v. Long Island R.R.*, 634 F.2d 19 (2d Cir. 1980), petition for cert. granted, 1981, 452 U.S. 960, 101 S.Ct. 3107, 69 L.Ed.2d 970, the Second Circuit Court of Appeals ruled that the Long Island Railroad Company, a rail common carrier owned and operated by the State of New York and which provided commuter service to the five counties within the metropolitan New York City area, was an integral governmental function within the meaning of *National League of Cities*. The issue in *United Transportation* was whether the employer-employee relationship between the Long Island and its employees was governed by New York's Taylor Law, N.Y. Civil Serv. Law §§ 200–214, which prohibits strikes by public employees, or by the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, which permits strikes. The Court distinguished its holding from that in *United States v. California, supra,* referred to in *National League of Cities,* first, on the grounds that the Long Island was primarily a passenger rail service and the rail service under consideration in *United States v. California* was primarily a freight service. Such a service is one that

> "state and local governments are particularly suited to provide because of the community-wide need—and it is a service they have come to provide by a process of economic elimination of private suppliers. *See Amersbach v. City of Cleveland,* 598 F.2d at 1037."

Second, the Court noted that the passenger rail service provided by New York in operating the Long Island was of much more importance to the public than the state-operated freight line in *United States v. California,* 634 F.2d at 27. The Court noted also that, because of the considerable funds injected into the operation of the Long Island by state and local governments, necessitated by its large operating deficits, the passenger rail service provided was one that no private businessman could afford to provide. Thus, only government was able to furnish the service. *Id.* at 28.

Upon September 17, 1979, the Wage and Hour Administration of the Department of Labor issued an Opinion Letter stating that local mass transit operations were not immune from the application of the FLSA. Opinion Letter No. 1552. *See* Plaintiffs' Brief in Opposition to Motion for Summary Judgment, at page 14. Subsequently, the Wage and Hour Division issued 29 C.F.R. § 775.3, listing local mass transit systems as non-traditional functions of state or their local subdivisions.

The operation of CARTA appears to qualify as an integral and traditional function of state or local government pursuant to the elements listed by the Sixth Circuit in *Amersbach v. City of Cleveland, supra.* The transit system is available to the public at a fraction of the actual cost of operation. In view of the large operating deficits that the system annually incurs, it is clear that the service is undertaken for the purpose of public service and not for pecuniary gain. Government has become the principal provider of mass transit, and, because of the costs of operating mass transit systems and because of the community-wide need for a means for mass transit, government is "particularly suited" to provide this service. The Court disagrees with some of the conclusions reached by the district court in *C. D. Joiner v. City of Macon* and further considers that case factually distinguishable. The Court does not interpret the Supreme Court's decision in *National League of Cities* as requiring that the particular state service or activity under scrutiny be "essential to the sovereign existence of the state." Some of the examples cited by the Supreme Court in *National League of Cities* as being immune from Congress' commerce clause power—such as parks and recreation—are not essential to the sovereign existence of the state. In addition, the application of the FLSA to the operation of a publicly-owned mass transit system does serve to "directly displace" the state or local government's ability to structure for itself the employer-employee relationships involved. The Court notes also that, although the federal interests in mass transportation are as great or even greater than the state's

interests, the federal government's interests in the employer-employee relationship that arise therefrom are not "demonstrably greater" than the interests held by the state. Finally, the Court notes that the operation of CARTA is conducted by participating local governments in a not-for-profit manner, and it does not, and appears to never have been intended to, pay its own way, unlike the transit system under scrutiny in the *Joiner* case. Accordingly, the Court concludes that the operation of CARTA is an integral and traditional function of the participating local political subdivisions of the States of Tennessee and Georgia within the scope of *National League of Cities v. Usery*, and that it is immune from the application of the overtime pay provisions of the Fair Labor Standards Act by virtue of the Tenth Amendment.

An appropriate order will enter sustaining the defendant's motion for summary judgment and dismissing this lawsuit.